Eric L. Zagar
Robin Winchester
**BARROWAY TOPAZ KESSLER**
   **MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Fax: (610) 667-7056
ezagar@btkmc.com
rwinchester@btkmc.com

Robert D. Mitchell, 011922
Julie M. Beauregard, 023093
Sarah K. Deutsch, 026229
**MITCHELL & ASSOCIATES**
A Professional Corporation
Viad Corporate Center, Suite 1715
1850 North Central Avenue
Phoenix, Arizona  85004
Telephone (602) 468-1411
Fax (602) 468-1311
robertmitchell@mitchell-attorneys.com
juliebeauregard@mitchell-attorneys.com
sarahdeutsch@mitchell-attorneys.com
www.mitchell-attorneys.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| TIMOTHY HALL, Derivatively on Behalf of Nominal Defendant MATRIXX INITIATIVES, INC., | ) ) ) |
| Plaintiff, | ) Case No. |
| v. | ) ) |
| WILLIAM J. HEMELT, SAMUEL C. COWLEY, CARL J. JOHNSON, L. WHITE MATTHEWS, III, MICHAEL A. ZEHER, WILLIAM C. EGAN, LORI H. BUSH, and JOHN M. CLAYTON, | ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| MATRIXX INITIATIVES, INC., | ) ) |
| Nominal Defendant. | ) ) |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Timothy Hall ("Plaintiff"), by the undersigned attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein, and alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and an investigation undertaken by Plaintiff's counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of nominal defendant Matrixx Initiatives, Inc. ("Matrixx" or the "Company") against certain members of Matrixx's Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties.

2.      The Individual Defendants (as defined herein breached their fiduciary duties by, among other things, (1) misrepresenting the safety of the Company's Zicam Cold Remedy Products (The Zicam Cold Remedy Products refer to Zicam Cold Remedy Nasal Gel; Zicam Cold Remedy swabs; and Zicam Cold Remedy, Kids Size) and failing to warn consumers and shareholders that the Zicam Cold Remedy Products could result in anosmia (loss of smell) despite their actual knowledge of the problem; and (2) failing to disclose to the United States Food and Drug Administration ("FDA"), despite the Company's obligation to do so, the existence of numerous reports of serious adverse events relating to the loss of smell associated with the use of Zicam Cold Remedy Products.

3.      Specifically, for several years the Individual Defendants were aware that Matrixx had received hundreds of serious adverse events reports from consumers concerning the loss of smell caused by the Company's Zicam Cold Remedy Products.  The Individual Defendants, acting on behalf of the Company, knowingly failed to report these adverse events to the FDA despite the Company's obligation to do so.  The Individual Defendants, acting on behalf of the Company, knowingly failed to comply with FDA regulations despite their repeated assurances of the Company's compliance.

4.      The failure of the Individual Defendants to report the serious adverse events to the FDA created the false impression that the Zicam Cold Remedy Products were safe and

effective remedies for consumers.  By failing to report the serious adverse events associated with the Zicam Cold Remedy Products, the Individual Defendants caused the true risks associated with the use of these products to be concealed from the public and the Company's shareholders.

5. Finally, on June 16, 2009, the FDA recalled the Zicam Cold Remedy Products and told consumers to stop using them because of the risk of permanent damage to the sense of smell.  In a warning letter from the FDA to the Company on the same date ("FDA Warning Letter"), the FDA stated that the agency was aware that Matrixx had received *more than 800 reports* related to loss of sense of smell associated with the Zicam Cold Remedy Products that were not submitted to the FDA as required by law.

6. As a result of the FDA advisory regarding the Zicam Cold Remedy Products, the FDA Warning Letter, and the revelation of the existence of more than 800 serious adverse incidents in the Company's possession that went unreported to the FDA, Matrixx's stock price plummeted $13.46 to close on June 16, 2009 at $5.78, a one day drop of nearly *70%*.

7. As a result of the Individual Defendants' breach of their fiduciary duties, the Company has sustained significant damages, as alleged herein.

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 in that Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.  This action is not a collusive one to confer jurisdiction on a court of the United States of America which it would not otherwise have.

9. Venue is proper in this District pursuant to 28 U.S.C. §1391(a) and (c) in that a substantial part of the events or omissions giving rise to the claim occurred in this District, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

**PARTIES**

10.     Plaintiff, a citizen of Nevada, is a shareholder of Matrixx, was a shareholder of nominal defendant Matrixx at the time of the wrongdoing alleged herein and has been a shareholder of Matrixx continuously since that time.

11.     Nominal defendant Matrixx is a Delaware corporation with its principal executive offices located at 8515 East Anderson Drive, Scottsdale, Arizona 85255. According to its public filings, Matrixx develops, produces, markets and sells over-the-counter healthcare products.

12.     Defendant William J. Hemelt ("Hemelt"), a citizen of Arizona, has served as the Company's Acting President, Chief Operating Officer and Chief Financial Officer since October 2008.

13.     Defendant Samuel C. Cowley ("Cowley"), a citizen of Arizona, has served as a director of Matrixx since July 2005 and as the Company's Executive Vice President, Business Development, General Counsel and Secretary since May 2008.

14.     Defendant Carl J. Johnson ("Johnson"), a citizen of Arizona, served as a director of Matrixx and as the Company's President and Chief Executive Officer from July 2001 until his retirement on October 31, 2008.

15.     Defendants Hemelt, Cowley, and Johnson are referred to herein as the "Officer Defendants."

16.     Defendant L. White Matthews, III ("Matthews"), a citizen of Wyoming, has served as a director of Matrixx since March 2003.

17.     Defendant Michael A. Zeher ("Zeher"), a citizen of New York, has served as a director of Matrixx since September 2000.

18.     Defendant William C. Egan ("Egan"), a citizen of New Jersey, has served as a director of Matrixx since August 2001.

19.     Defendant Lori H. Bush ("Bush"), a citizen of California, has served as a director of Matrixx since October 2004.

20.     Defendant John M. Clayton ("Clayton"), a citizen of Tennessee, has served as a director of Matrixx since October 2005.

21.     Defendants Matthews, Zeher, Egan, Bush, and Clayton will be referred to as the "Director Defendants."

22.     Collectively, the Officer Defendants and Director Defendants will be referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

23.     By reason of their positions as officers, directors, and/or fiduciaries of Matrixx and because of their ability to control the business and corporate affairs of Matrixx, the Individual Defendants owed Matrixx and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Matrixx in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Matrixx and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Matrixx and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

24.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Matrixx, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

25.     To discharge their duties, the officers and directors of Matrixx were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Matrixx were required to, among other things:

       a.     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

b.      exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.      when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

d.      refrain from acting upon material inside corporate information to benefit themselves.

26.      The Company's Code of Ethics provides that:

The directors, officers and employees of Matrixx and any professional advisors of Matrixx, while they are engaged to work for or on behalf of the Company, (all of whom may sometimes be referred to herein as "Members" of the Company) *must at all times conduct themselves and their activities on behalf of the Company with uncompromising honesty and integrity. . . . They are expected to be honest and forthright in dealing with each other and with the Company's customers, vendors, advisors and other third parties.* This approach should be consistent and habitual. Doing the right thing means doing it right every time. Matrixx's philosophy is that the Company's business practices should be compatible with the commercial, economic and social priorities of any locale in which it operates. While the style of commercial dealings may vary among certain industries and in different cultures, we believe that honesty and integrity must always characterize our business activity and will never be the subject of criticism.

Every Member of the Matrixx family, whether he or she works for us within the Company or with us as an outside advisor, is at all times expected to:

- act with honesty and integrity, avoiding actual or apparent conflicts of interest between personal and professional relationships, and, in cases where an actual or apparent conflict of interest arises, taking appropriate and timely action to notify management of such conflict and to remove him or herself from the situation that gives rise to the conflict;

- comply with all applicable laws, regulations and rules of federal, state, local and foreign governments and regulatory authorities;

- ensure that information provided in the Company's periodic reports filed with the SEC and in other public communications is accurate, complete, fair, objective, relevant, timely and understandable;

- act responsibly and in good faith in the execution of his or her duties, with due care, competence and diligence, *without misrepresenting material facts* or allowing one's independent judgment to be compromised;

* * *

Members of Matrixx are expected to comply at all times with all federal, state, local and foreign laws and regulations affecting the Company and its business. If any Member is uncertain about the existence or effect of a particular law on his or her conduct on behalf of the Company, such individual should consult with management. If appropriate, management is further encouraged to consult with the Company's legal advisors to determine appropriate action. In particular, and without limiting the generality of the foregoing statements:

- Any action taken to intentionally evade the payment of any tax, or the violation of any law relating to taxation of property, services, sales, income or any other matters, including failure to file reports or returns on a timely basis (other than with the approval of the applicable taxing authority) or filing false or fictitious reports or returns, is prohibited.

- Any action taken to intentionally circumvent the requirements of any federal, state, local or foreign health or safety law applicable to the Company's products, or any action taken to intentionally mislead the U.S. Food and Drug Administration or any other health and safety regulator regarding the safety and efficacy of the Company's products is prohibited.

- Any action taken to intentionally mislead the investing public, the SEC, the Nasdaq National Market or any other federal or state securities regulatory authority regarding the Company's business, legal or financial affairs or regarding any material event or circumstance affecting the Company (including any failure to make necessary public disclosures in respect thereof) is prohibited.

(Emphasis added).

## FACTUAL ALLEGATIONS

27. Matrixx develops, produces, markets and sells over-the-counter healthcare products. The Company through its subsidiaries produced, marketed and sold, among other pharmaceutical products, the Zicam Cold Remedy Products.

28. Matrixx sold the Zicam Cold Remedy Products directly to major food, drug, mass market, and wholesale warehouse retailers throughout the United States, and to

distributors that sold to smaller retail establishments.  The Zicam Cold Remedy products were sold in virtually every major food, drug, and mass merchant retail outlet in the country.

29.    The Zicam Cold Remedy Products were by far the Company's most important products and were responsible for the overwhelming majority of the Company's revenues, accounting for approximately 68% of the Company's total revenues over the last five years.

30.    The Zicam Cold Remedy Products, which were available to consumers for purchase without a prescription, contained the active ingredient zinc gluconate (or zincum gluconicum).  The products were administered by direct application to the nasal cavity and were intended for use in "adults and children 3 years of age and older (with adult supervision)."

31.    The product labeling that accompanied the Zicam Cold Remedy Products stated that each of these products "reduces" the "duration of the common cold" and the "severity of cold symptoms," including "sore throat, stuffy nose, sneezing, coughing and congestion."

32.    Although the Zicam Cold Remedy Products did not require pre-market approval by the FDA, all of Matrixx's products are subject to various FDA regulations, including regulations with respect to their manufacturing processes and procedures, ingredients in the products, labeling and claims made.  In addition, Matrixx's claims and advertising are subject to the rules of the Federal Trade Commission ("FTC").

33.    The Zicam Cold Remedy Products came on the market in 1999, and since shortly after their introduction Matrixx received thousands of reports of patients losing their sense of smell after using the products.  The Individual Defendants were well aware of these reports, as they threatened the Company's most important and best selling product.  Indeed, since 2003 hundreds of consumers have filed products liability lawsuits against the Company alleging that Zicam Cold Remedy Products had caused them to sustain permanent damage to their sense of smell.

34.     The Individual Defendants, however, consistently denied the reports, touted the purported safety of the products, and accused the Company's critics of having ulterior motives.

35.     For example, on February 2, 2004, in response to report by Dow Jones reporter Carol Remond that the FDA may have been investigating consumer complaints of anosmia related to the use of Zicam Cold Remedy Products, the Individual Defendants who were then with the Company caused Matrixx to issue a press release vehemently denying that the products caused anosmia:

> All Zicam products are manufactured and marketed according to FDA guidelines for homeopathic medicine. Our primary concern is the health and safety of our customers and the distribution of factual information about our products. Matrixx believes statements alleging that intranasal Zicam products cause anosmia (loss of smell) are completely unfounded and misleading.

> In no clinical trial of intranasal zinc gluconate gel products has there been a single report of lost or diminished olfactory function (sense of smell). Rather, the safety and efficacy of zinc gluconate for the treatment of symptoms related to the common cold have been well established in two double-blind, placebo-controlled, randomized clinical trials. In fact, in neither study were there any reports of anosmia related to the use of this compound. The overall incidence of adverse events associated with zinc gluconate was extremely low, with no statistically significant difference between the adverse event rates for the treated and placebo subsets.

> A multitude of environmental and biologic influences are known to affect the sense of smell. Chief among them is the common cold. As a result, the population most likely to use cold remedy products is already at increased risk of developing anosmia. Other common causes of olfactory dysfunction include age, nasal and sinus infections, head trauma, anatomical obstructions, and environmental irritants.

> The circumstances surrounding the development of Ms. Remond's column are extremely suspect. The article appeared online in public financial message boards almost immediately following its availability through the Dow Jones "In The Money" subscription-only service. At least one of these message board postings was made by a registered username frequently used by Floyd Schneider, a defendant currently being sued for defamation by Matrixx Initiatives. From at least August 2001 to the present, Schneider has posted false and defamatory statements about Matrixx on various Internet message boards using a variety of anonymous aliases. It has come to our

attention that Schneider has also attempted to interfere with Matrixx' business by contacting our retail customers.

Ms. Remond's article appears on today's Dow Jones Newswire -- the very day that Matrixx Initiatives is deposing Schneider. We believe that the timing of this article was manipulated by Schneider to interrupt the deposition process. We know that Ms. Remond and Schneider were in close communication during the development of Ms. Remond's article and even discussed the disclosure statement detailing the basis for our suit against Schneider, which has not yet been made public. Therefore, it is particularly troubling that Ms. Remond neglected to mention the defamation action or that Schneider was one of her chief sources of information. We consider her failure to mention these facts to be a significant omission in fair and balanced reporting.

Matrixx Initiatives would like to underscore that we intend to vigorously pursue those individuals involved in any effort to improperly discredit the company and its products. Furthermore, we strongly urge Dow Jones to open its own investigation to determine whether Dow Jones' credibility was undermined by the use of copyrighted material in an attempt to do further harm to the value and reputation of Matrixx Initiatives and its products.

36.    On February 9, 2004, *The New York Post* reported:

The question: Can zinc-based products like Zicam destroy a person's sense of smell?

AN intriguing press release crossed my desk last week. The document bore the name of an Arizona company called Matrixx Initiatives Inc., which makes a line of homeopathic cold remedies.

Thanks to some alleged health problems that published reports have tied to the use of one of its products, Matrixx's Nasdaq-listed shares have been getting knocked around quite a bit lately.

The aforementioned press release was apparently intended to contain the damage, calm investors down, and put some oomph back in the company's stock, which at one point last week had fallen by nearly 50 percent from its early January level of more than $19 per share.

Fortunately for the company, by week's end Matrixx's share price had at least stopped falling; it actually inched back up a few cents in after-hours trading Friday evening to hit $10.43 per share.

Yet it remains to be seen how long the calm will last before turmoil breaks out in the stock all over again because concerns continue to mount over the effects of zinc-based products like Matrixx's Zicam nasal spray, used to treat nasal congestion from the common cold.

The main health question in the Zicam spat concerns whether zinc-based products such as Zicam can permanently destroy a person's sense of smell by inducing a medical condition known as amnosia.

Matrixx last week issued a series of statements insisting that the claims against Zicam are "completely unfounded and misleading" and that "no clinical trials" have produced a single instance of a person losing his or her sense of smell from using Zicam.

*Yet alarming anecdotal evidence is beginning to accumulate that Zicam can cause just that. On Friday, Jan. 30, the Dow Jones news wires reported that the U.S. Food and Drug Administration has begun investigating complaints from consumers who say they've used Zicam and lost their sense of smell as a result.*

*Last week, ABC's "Good Morning America" carried a lengthy report on Zicam users who claim to have suffered the same fate. A Denver woman named Linda Bayley complained of using Zicam as directed and of reeling from an intense burning sensation afterward, followed by a total loss of her sense of smell.*

*Dr. Bruce Jafek of the University of Colorado Center For Taste and Smell Disorders says Linda Bayley is one of more than a dozen such patients he has recently examined who have reported the same reaction from using Zicam.*

*Since October, lawsuits against Matrixx have been filed in Michigan, Arizona, Alabama and California. In them, plaintiffs complain of having used Zicam as directed and of instantly experiencing an excruciating burning sensation in their nasal passages, followed by a complete and seemingly permanent loss of the sense of smell.*

*WITH litigation piling up against it, the company has responded with what appears to be one of the most misguided and counterproductive public relations campaigns imaginable. Instead of issuing an immediate, nationwide recall of Zicam until the cause of the problem can be isolated and fixed, Matrixx issued a press release last Monday in the wake of the Dow Jones story, insisting that Zicam is totally safe.*

Worse, the Matrixx press release claimed that Matrixx knew of no FDA inquiry into Zicam, and that the Dow Jones story had been fed to the writer by an individual named Floyd Schneider, whom Matrixx claimed to be suing for allegedly posting false and defamatory messages about the company on the Internet.

*In fact, though the FDA may not have notified Matrixx of its inquiry, it is impossible for Matrixx not to have known of the existence of the probe - since the Dow Jones story the previous Friday had quoted an FDA spokesperson as confirming the*

*FDA's interest in the matter. An FDA official reconfirmed the existence of the inquiry for this column late last week.*

Nor did the question of where or how the Dow Jones writer, Carol Redmond, got her information seem relevant to anything. The only thing that mattered was whether her facts were correct, which they appear to be - and the Matrixx bunch seems to have known it, though at week's end they repeated their statement, now more precisely crafted, about being unaware of any investigation regarding Zicam.

Meanwhile, a lot of information that Matrixx really should be disclosing to shareholders doesn't seem to be reaching them at all - at least not by way of the company.

For example, in Matrixx's latest 10Q quarterly financial report to the Securities and Exchange Commission, filed on Nov. 11, 2003, the company acknowledged that it faces "significant liability should use or consumption of our products cause injury, illness or death," and that even a single product liability claim, whether the claim has any merit or not, could have a materially adverse effect on Matrixx's entire business.

*That being so, it is hard to understand why the first of the product liability suits filed against Matrixx - in Kalamazoo, Mich., on Oct 13, 2003, a full month before the 10Q itself was filed with the SEC - wasn't mentioned in the Nov. 11 filing, as it obviously should have been.*

Most recently, the company issued a press release on Jan. 7, 2004, increasing its full-year earnings forecast for 2003 by eight cents per share. *But it has so far made no known statements regarding the growing number of product liability lawsuits against it, which now total four.*

IS there some infinitely tedious reading of the SEC's rules and regulations to justify this silence? I'm sure there is - some little nugget of exculpatory weaseling by which it becomes OK to break out the press release pom-poms for an eight-cents-per-share Beat The Street hooray, while staying deaf and dumb on an avalanche of lawsuits in which people all over America are claiming to have been maimed for life by squeezing a spray of Zicam up their beezers to get rid of a cold.

I'm sure as well that the language, as crafted in the company's two press releases last week, will be found to contain enough artfulness and ecclesiastical slipperiness to allow the company to claim that it really didn't intend to say what the plain meaning of the release's words make undeniable - that it knew nothing of an FDA inquiry into the apparent health risks of Zicam.

(Emphasis added).

37.     On April 28, 2004, the Individual Defendants who were then with the Company caused Matrixx to issue a press release which stated:

- 11 -

Matrixx Initiatives, Inc., maker of Zicam(R) Cold Remedy and other products, today reported triple-digit earnings growth for the First Quarter 2004 -- versus the same period in 2003 -- during its annual meeting of shareholders. Matrixx achieved these results despite what the company believes is an apparent attempt by some in the financial industry to unfairly attack the company's products and devalue its stock.

During the annual shareholders' meeting, company executives discussed the most recent attacks, which began with a poster presentation by Bruce Jafek, MD, Rocky Mountain Taste and Smell Center at the University of Colorado Medical Center, attempting to link intranasal zinc gluconate gel-the active ingredient in Zicam Cold Remedy nasal gels-to anosmia (loss of smell). The poster was presented at a conference of the American Rhinologic Society (ARS) in September 2003. These attacks have included false and defamatory Internet postings as well as product liability litigation that focuses on the alleged link between Zicam Cold Remedy and anosmia, as described in the poster presentation.

"When we first learned of the poster presentation, we became suspicious," said Carl J. Johnson, President and Chief Executive Officer of Matrixx Initiatives, Inc. "The presentation appeared to be very unscientific, relying on a weak anecdotal case study of one patient with multiple risk factors for loss of smell. The conclusions were not supported by medical literature or the company's peer-reviewed clinical studies. In addition, the conclusions were based on studies with zinc sulfate, a completely different compound than zinc gluconate."

Matrixx recently discovered that Dr. Jafek's son "sold short" shares of the company's stock just before the presentation. Those transactions would result in a significant financial gain if the company's stock price dropped following the presentation. At the time, his son was employed in the investment community.

"We wondered why a physician would present data using such scientifically inappropriate protocols and could arrive at such unsubstantiated conclusions based on two completely different substances," said Johnson. "Loss of smell due to intranasal zinc gluconate had never been reported in any clinical research, nor were any cases of loss of smell observed in two Matrixx-sponsored peer-reviewed clinical trials with Zicam nasal gel."

38.     Notwithstanding the Individual Defendants' tactics, throughout 2004 and 2005 more and more consumers filed products liability lawsuits against the Company alleging that Zicam Cold Remedy Products had caused them to sustain permanent damage to their sense of smell.

39.     In January 2006, Matrixx reached a settlement with approximately 340 plaintiffs in which the Company agreed to pay a total of $12 million.

40.     For the next three years the Individual Defendants continued to maintain, however, that the Zicam Cold Remedy Products were safe and did not cause anosmia.

41.     On December 26, 2006, Congress passed the Dietary Supplement and Nonprescription Drug Consumer Protection Act (the "Act").  The Act requires manufacturers of nonprescription drugs to submit to the FDA any report received of a "serious adverse event" associated with such drug within 15 business days after the report is received.  The Act took effect on December 22, 2007.

42.     The Act defines a "serious adverse event" as one which results in: (i) death; (ii) a life-threatening experience; (iii) inpatient hospitalization; (iv) *a persistent or significant disability or incapacity*; or (v) a congenital anomaly or birth defect; or requires, based on reasonable medical judgment, a medical or surgical intervention to prevent an outcome described above.

43.     The Act requires the manufacturer of a nonprescription drug marketed in the United States to submit to the FDA any report received of a "serious adverse event associated with such drug when used in the United States, accompanied by a copy of the label on or within the retail package of such drug."

44.     The Act further requires the manufacturer to submit to the FDA a serious adverse event report no later than 15 business days after the report is received.

45.     Pursuant to the Act, Matrixx was under an obligation to submit to the FDA any reports of serious adverse events involving the Zicam Cold Remedy Products, e.g., reports of anosmia.

46.     After the Act became effective on December 22, 2007, the Individual Defendants knew that Matrixx continued to receive hundreds of reports of adverse events regarding the Zicam Cold Remedy Products and loss of smell.  Although the Individual Defendants represented in the Company's annual Form 10-K filings and elsewhere that the

Company was in compliance with all applicable regulatory requirements, they knew that Matrixx had ***not*** submitted the adverse event reports to the FDA as required by the Act.

47.     On June 16, 2009, the FDA recalled the Zicam Cold Remedy Products and advised consumers to stop using them because of the risk of permanent damage to the sense of smell.  In addition, the FDA issued a warning letter to Matrixx asking the company to stop marketing its zinc-based products.  The FDA further required the Company to submit safety and effectiveness data on the drug to the FDA prior to marketing Zicam Cold Remedy Products.

48.     The FDA Warning Letter stated that a "significant and growing body of evidence substantiates that the Zicam Cold Remedy [Products] may pose a serious risk to consumers who use them."  Specifically, the FDA informed the Company that it had received over 130 reports of consumers losing their sense of smell and/or taste in conjunction with their use of the Zicam Cold Remedy Products.  According to the Warning Letter:

> FDA has concluded that these products may pose a serious risk to consumers who use them.  Specifically, FDA has received more than 130 reports of anosmia, (loss of sense of smell, which in some cases can be long-lasting or permanent), associated with use of these products.

> *     *     *

> By comparison, FDA has received few reports of anosmia associated with other widely-used intranasal products for treatment of the common cold that are marketed subject to approved NDA's or according to an OTC drug monograph.  Further, there is evidence in the published scientific literature that various salts of zinc can damage olfactory function in animals and humans.

49.     With regard to the safety of the Zicam Cold Remedy Products and the requirements with which Matrixx had failed to comply, the FDA Warning Letter stated:

> We are not aware of any data establishing that the Zicam Cold Remedy intranasal products are generally recognized as safe and effective for the uses identified in their labeling.  On the contrary, as described below, there is evidence that these products pose a serious safety risk to consumers.  Because they are not generally recognized as safe and effective for their labeled uses, these products are new drugs, as defined by section 201(p) of the Act, 21 U.S.C. § 321(p).

Under sections 301(d) and 505(a) of the Act, 21 U.S.C. §§ 331(d) and 355(a), a new drug may not be introduced or delivered for introduction into interstate commerce unless an FDA-approved application is in effect for it.  There are no approved new drug applications (NDA's) on file with FDA for any of the Zicam Cold Remedy intranasal products; you market them without FDA approval.

*   *   *

A homeopathic drug product marketed without an approved NDA is not subject to the enforcement discretion set forth in the CPG when there is evidence of a safety risk associated with the product, as is the case for the Zicam Cold Remedy intranasal products.  Under these circumstances, the Agency enforces the Act's new drug approval requirement, a provision that is essential to protect the public health by holding firms responsible for demonstrating, based on adequate and well-controlled clinical investigations, that a product is safe and effective for each of its intended uses before marketing it.  Therefore, an approved NDA is required for the Zicam Cold Remedy intranasal products, regardless of their homeopathic status.  Your introduction of the Zicam Cold Remedy intranasal products into interstate commerce, without an approved application, violates sections 301(d) and 505(a) of the Act, 21 U.S.C. §§ 331(d) and 355(a).

50.     The FDA Warning Letter also informed the Company that the Zicam Cold Remedy Products "are misbranded under section 502(f)(2) of the Act, 21 U.S.C. § 352(f)(2), because their labeling does not bear adequate warnings regarding the risk of anosmia associated with the product.  In light of this failure to bear adequate warnings, these products are also misbranded under Section 502(a) of the Act, 21 U.S.C. § 352(a)."

51.     The FDA Warning Letter further stated that "[i]n addition to the reports FDA has received directly from consumers, the agency is aware that Matrixx appears to have more than 800 reports related to loss of sense of smell associated with Zicam Cold Remedy [Products]."

52.     Despite having an obligation under the Act and under FDA regulations to submit to the FDA any report regarding a serious adverse event involving one of its nonprescription drugs, Individual Defendants, acting on behalf of the Company, failed to report these adverse events since the inception of the Act, while emphasizing to the public and the Company's shareholders that the Company complied with all applicable federal laws and government regulations.

53.     On June 16, 2009, the Individual Defendants caused Matrixx to issue a press release confirming its receipt of the FDA Warning Letter and announcing the withdrawal of the Zicam Cold Remedy Products from the market.

54.     In response to the foregoing news, Matrixx's stock price plummeted $13.46 to close on June 16, 2009 at $5.78, a one day drop of nearly **70%**.

55.     Thereafter, on June 23, 2009, Matrixx announced that on June 19, 2009, the Company had received an informal inquiry from the SEC requesting certain documents and information relating to the FDA Warning Letter.  Upon release of this information, Matrixx's stock priced declined even further to close on June 23, 2009 at $4.83.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

56.     The Individual Defendants breached their fiduciary duties by knowingly misrepresenting the safety of the Zicam Cold Remedy Products and failing to warn consumers that Zicam could result in anosmia despite the growing number of consumer complaints, and by knowingly failing to submit adverse event reports to the FDA as required by the Act.

57.     The Individual Defendants' misconduct was not, and could not have been, the result of an exercise of good faith business judgment because there could not possibly be a legitimate business reason to mislead the public and the Company's shareholders nor to violate applicable legal and regulatory requirements.  Indeed, the Individual Defendants' misconduct blatantly violates numerous provisions of the Company's Code of Ethics.

58.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained damages, including, but not limited to, costs and expenses incurred in connection with the SEC inquiry into the Company.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

59.     Plaintiff brings this action derivatively in the right and for the benefit of Matrixx to redress breaches of fiduciary duty by and unjust enrichment of the Individual Defendants.

60.     Plaintiff will adequately and fairly represent the interests of Matrixx and its shareholders in enforcing and prosecuting its rights.

61.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Matrixx Board of Directors to institute this action against the Individual Defendants. Such demand would be a futile and useless act because: (i) the misconduct complained of herein was not, and could not have been, the result of a good faith exercise of business judgment, as alleged in detail herein; and (ii) the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because all six of the Director Defendants, who collectively constitute the entire Board, face a substantial likelihood of being held liable for their misconduct, as alleged in detail herein.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY OF GOOD FAITH

62.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

63.     As alleged herein, each of the Individual Defendants owed to the Company and its shareholders a fiduciary duty to, among other things, exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

64.     The Individual Defendants breached their fiduciary duty of good faith by knowingly misrepresenting the safety of the Zicam Cold Remedy Products and failing to warn consumers that Zicam could result in anosmia despite the growing number of consumer complaints, and by knowingly failing to submit adverse event reports to the FDA as required by the Act, as alleged in detail herein.

65.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages, including, but not limited to, costs and expenses incurred in connection with the SEC inquiry into the Company.

66.   WHEREFORE, Plaintiff demands judgment as follows:

A.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.   Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

C.   Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.   Granting such other and further relief as the Court deems just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: September 11, 2009

/s/ Julie M. Beauregard

_____

Robert D. Mitchell
Julie M. Beauregard
MITCHELL & ASSOCIATES
A Professional Corporation
Corporate Center, Suite 1715
1850 North Central Avenue
Phoenix, Arizona  85004
           -and-
Eric L. Zagar
Robin Winchester
BARROWAY TOPAZ KESSLER
    MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Fax: (610) 667-7056

*Attorneys for Plaintiff*